UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

   -v-                                                    CASE NO: 5:16-CR-00108-GTS

JASON KOPP,
                        Defendant.

---

# **SENTENCING MEMORANDUM**

DATED: August 24, 2016                           Respectfully submitted,

                                                             LISA A. PEEBLES
                                                              Federal Public Defender

                                         By:    Randi J. Bianco, Esq.
                                                           Assistant Federal Public Defender
                                                           Bar Roll No. 507514
                                                           Clinton Exchange, 3rd Floor
                                                           4 Clinton Square
                                                           Syracuse, New York   13202
                                                           (315) 701-0080

I.  **PRELIMINARY STATEMENT**

On May 20, 2016, Jason Kopp [hereinafter "Jason] pled guilty to 22 counts of a 28-count Indictment. Count 1 charges Conspiracy to Sexually Exploit a Child, in violation of 18 U.S.C. § 2251(a); Counts 2, 3, 6, 7, 8, 9, 10, 11, 12, and 13 charge Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a); Counts 14, 15, 16, 17, 18, 19, 20, 21, and 22 charge Distribution of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A); and Counts 27 and 28 charge Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). PSR ¶ 1. Jason's sentencing is scheduled for September 13, 2016. The United States Probation Department prepared a Presentence Investigation Report (*hereinafter* "PSR") on July 27, 2016, in anticipation of Jason's sentencing.  The PSR sets forth a total advisory Offense Level of forty-three (after acceptance) and a Criminal History Category of I. PSR ¶ 197, 204. Jason has raised his objections to the factual contents contained in the PSR with probation.

The Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005) excised the provisions in the Sentencing Statute which made the guidelines mandatory, thus holding the guidelines are merely advisory.  Therefore, in determining a sentence, a court must equally consider the guideline calculations, the unique characteristics of the defendant, as well as other statutory concerns listed in 18 U.S.C. § 3553(a), specifically:

(1)  The nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  The need for the sentence imposed
    (A)  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)  To afford adequate deterrence to criminal conduct;
    (C)  To protect the public from further crimes of the defendant; and
    (D)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a).

Jason respectfully submits this memorandum in support of a sentence "sufficient, but not greater than necessary" to achieve the statutory purposes of punishment as required by 18 U.S.C. § 3553(a)(2). In light of the objectives of sentencing and Jason's steady employment history, supportive family, and mental condition resulting from traumatic experiences, Jason requests a sentence at the statutory mandatory minimum term of fifteen years' imprisonment on each count imposed to run concurrently to be followed by lifetime supervision.

## II. 18 U.S.C. § 3553(a) FACTORS

### 1. History and Characteristics of the Offender

#### A. Traumatic Experiences and Mental Health

Jason's background involves events that gravely affected the person he is today. As a child, Jason was physically abused by his step-father. PSR ¶ 207. His step-father pushed, hit, and spanked Jason, as well as his sister and mother. *Id.* This abuse continued until Jason's mother divorced his step-father when he was twelve years old. *Id.*

While the physical abuse was occurring, Jason began to be sexually abused by a teenage boy in his neighborhood starting at age ten. PSR ¶ 208. This sexual abuse continued for approximately five years until Jason was fifteen. *Id.* Embarrassed and traumatized, Jason never disclosed the abuse and never received counseling. This type of non-disclosure is not surprising and tends to be very common among victims of sexual abuse. In fact, empirical research demonstrates that a majority of child sexual abuse victims do not disclose during childhood. *See* K. London et al., *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways That Children Tell?* (2005). Furthermore, male victims are even less likely to disclose their abuse than their female counterparts. *See* S.E. Ullman et al., *Gender Differences in Social Reactions to Abuse Disclosures, Post-Abuse Coping, and PTSD of Child Sexual Abuse Survivors* (2005).

The sexual abuse Jason suffered seriously affected his long-term well-being. The combination of the physical and sexual abuse during Jason's formative years led him to be held back in elementary school. As is well-documented in psychological research, there are numerous consequences associated with being a victim of child sexual abuse. Specifically, child sexual abuse has been strongly correlated with depression, suicide, sexual promiscuity, and poor academic achievement. *See* E.O. Paolucci et al., *A Meta-Analysis of the Published Research on the Effects of Child Sexual Abuse* (2001). Being a victim of child sexual abuse is also correlated with becoming an offender later in life. *Id.* Unfortunately, Jason became part of this cycle of sexual abuse.

In the more recent past, Jason has had to handle his father's early dementia, depression and attempted suicides. Jason and his father were very close and lived together in an apartment from Jason's early twenties to his late thirties. Jason's father was diagnosed with depression in 1996 and has been on medications since his diagnosis. His father has attempted to commit suicide several times, often leaving suicide notes for Jason to find. The last suicide attempt was five years ago. At that time Jason was sharing an apartment with his father and he came home on a lunch break from work. Jason's father confessed that he tried to kill himself by cutting his wrist and trying to electrocute himself. Jason had to call 911 for his father's safety and his father was taken to a psychiatric hospital. He later found several suicide notes that his father had planned to leave behind for him. The notes stated that he was sorry, not to come into this room because he would be dead and to call 911. After the attempted suicide, Jason became his father's caregiver for more than two years. In order to assure his father's safety, Jason would take his father to therapy and make sure he took his medication. Jason was very shaken up and constantly worried about his father's well-being. He was never entirely sure whether his father was going to take his life, as there were times that his father would stop taking his medication, causing Jason

3


incredible stress. Per his mother, all three of Jason's paternal uncles have tried to commit suicide as well, putting Jason at risk for this behavior. As this incident occurred approximately five years ago, it contributed to Jason's mental state preceding the occurrence of the instant offenses.

An attempted suicide by a parent can have extremely adverse effects on offspring. Specifically, empirical research has demonstrated that offspring of a parent that has attempted suicide are six times more likely to attempt suicide themselves. *See* D.A. Brent et al., *Familial Pathways to Early-Onset Suicide Attempt: Risk for Suicidal Behavior in Offspring of Mood-Disordered Suicide Attempters* (2002). Significantly, this probability increases to an even greater likelihood in the event that the offspring has experienced sexual abuse. *Id.* Jason is a prime example of the category of offspring that this research outlines. After having experienced sexual abuse as a child, Jason had to endure his father's suicide attempt as an adult. These experiences were the perfect storm to create Jason's altered mental state and, in turn, led to the instant offenses.

Jason suffers from a Depressive Disorder NOS with Schizoid and Avoidant Personality Features, a determination made by psychologist, Dr. Thomas Lazzaro. Dr. Lazzaro determined that Jason's mental state is in great part due to the sexual abuse that he experienced as a child. Jason began experiencing feelings of depression at fifteen years old, which was the same age his sexual abuse ended. PSR ¶ 208, 215. Dr. Lazzaro contends that this altered mental state played a large role in the commission of his crimes and that Jason committed the instant offenses as a means of coping with his depression. Jason's mother reports that this depression has continued into his adulthood, as Jason was taken to St. Joseph's Hospital's Comprehensive Psychiatric Emergency Program (CPEP) about six years ago after trying to commit suicide himself. After Jason's father attempted suicide and his former girlfriend abandoned him, Jason attempted to purchase a gun to end his own life. PSR ¶ 213, 215

**B. Employment**

Despite his multiple negative experiences, Jason has a lengthy work history with consistent employment dating back fifteen years. During a five-year period from approximately 2002 to 2007, Jason worked at *both* Petco and TJ Maxx. PSR ¶ 222. At Petco, he served as an animal and reptile specialist, and at TJ Maxx, he began as a custodian and became a back room coordinator. In 2009, Jason obtained a full-time position at Speedy Medical Transport as a driver. PSR ¶ 221. Jason worked at Speedy Medical Transport for five years, having to leave when he wanted to work more hours than were available. *Id.* In 2013, Jason worked for Sysco for approximately five months and then worked stocking at Walmart for approximately four months. PSR ¶ 220. In 2014, he found a more stable position at Third Party Logistics, working there until the time of his arrest. PSR ¶ 219. At Third Party Logistics, Jason delivered medical supplies and medications to facilities, working seven days per week.

This Circuit has held that a downward variance based on a defendant's employment history is merited where there are exceptional or extraordinary circumstances. *United States v. Jagmoha*n, 909 F.2d 61, 65 (2d Cir. 1990) (holding that the defendant's nine-year employment history was an indicator of his "stable background" and one of two factors warranting a downward variance in sentencing); *see also United States v. Big Crow*, 898 F.2d 1326 (8th Cir. 1991) (affirming a district court's decision to grant a downward variance given the defendant's "excellent employment record" for six years). Jason's case is one that meets the level of extraordinary and warrants a downward variance in his sentence.

**C. Education**

To assist in furthering his employment opportunities, Jason has also taken vocational classes. In addition to his high school diploma, Jason has a commercial driving certificate and

Class A CDL license. PSR ¶ 217. Jason attended the National Tractor Trailer School in 2010, completed the program and earned a certificate. *Id.*

### D. Military History

Before his steady employment endeavors, Jason served in the military from February 1996 to October 1997. PSR ¶ 218. He served with the mortar platoon being deployed out of airplanes. Jason's service ended when his wife continued to have Jason pulled from the field for alleged emergencies. Jason was then given the choice between staying in the military and having his wife leave the base, or leaving the military. Jason chose to continue to live with his wife so he left the military.

### E. Family Support

Jason is an important member of his family, who will assist in his rehabilitation.[1] Many of Jason supporters, including his fiancé, have asked the court for leniency for Jason and have described his many good qualities. Jason has served a particularly important role in the life of his sister, Kimberly. (See Support Letters) Kimberly has a learning disorder and Jason has always been a helpful and protective brother towards her. Jason has also served as a caregiver for his father, being there 100% while his father suffered from depression and suicidal ideation. Jason's fiancé, Nicole, his mother, father, sister, aunt, and cousin will assist in his rehabilitation for him after his release in any way possible. With a supportive family encouraging his progress and treatment, Jason will be able to reintegrate into society smoothly and remain a law-abiding member of society.

## 2. Need for Treatment

Section 3553(a)(2)(D) requires the Court to look at the defendant's need for "educational or vocational training, medical care, or other correctional treatment in the most effective manner" when imposing a sentence. Furthermore, the Second Circuit has held that a court may

---

[1] See support letters from family submitted under separate cover.

grant a downward variance where "extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense." *United States v. Rivera*, 192 F.3d 81, 85 (2d Cir. 1999). Jason's background and history clearly illustrate he has suffered severe childhood trauma that unquestionably played a role in his commission of the instant offenses.

Significantly, Jason has never received counseling or treatment for his condition. This is likely a result, in part, of the manner in which men handle depression. Research demonstrates that men are significantly less likely than women to report or get help with their depression. *See* K.A. Wilhelm, *Men and Depression* (2009). Additionally, men are more likely than women to deal with their feelings of depression through risky actions, such as drug or alcohol abuse, road rage, and suicide. *Id.* In Jason's case, unfortunately, his risky actions took the form of the conduct that led to the instant offense. Since his arrest, however, Jason has realized that he needs treatment to better himself and reenter society. He is extremely amenable to treatment in order to deal with the mental and emotional conditions that led him to commit the present offenses. PSR ¶ 67. If Jason was able to receive counseling and treatment, he could benefit immensely. Sentencing Jason to receive treatment during his sentence and continue to do so after his release would be the best course toward Jason's rehabilitation.

**3. Jason's Age and Low Risk of Recidivism**

Jason is presently 40 years old and, should the Court sentence him to the mandatory minimum sentence of 15 years, he will be 55 when released. The Sentencing Commission has found that advanced age should be considered at sentencing and that there is an inverse correlation between recidivism rates and age. United States Sentencing Commission, *Measuring Recidivism: the Criminal History Computation of Federal Sentencing Guidelines*, (May 2004). The Sentencing Commission found that less than 10% of defendants over fifty years of age

7

committed another crime. *Id.* at 28. Controlling for criminal history category, only 6.2% of the defendants over age fifty that were in a Criminal History Category of I committed another offense. *Id.* at 28.

While there is some evidence that sex offenders pose a higher risk of recidivism than other criminal defendants, *see, e.g.*, *United States v. Hayes*, 445 F.3d 536, 537 (2d Cir. 2006) (citing H.R. Rep. No. 107-527, at 2 (2002)), other studies focusing on sexual offenders found results similar to those found by the Sentencing Commission: recidivism decreases with age for all offender types. *See, e.g.*, R. Karl Hanson, *Age and Sexual Recidivism: A Comparison of Rapists and Child Molesters* (2001).

Even if the recidivism rates of the entire population of sex offenders are generally higher than the population of other criminal defendants, a point Jason does not concede, studies have demonstrated that sex offenders receiving treatment are less likely to recidivate than sex offenders who remain untreated. *See*, *e.g.*, Karen Kersting, *New Hope for Sex Offender Treatment,* MONITOR ON PSYCHOLOGY (Aug. 2003); John Q. LaFond & Bruce J. Winnick, *Sex Offender Reentry Courts: A Proposal for Managing the Risk of Returning Sex Offenders to the Community*, 34 Seton Hall L. Rev. 1173, 1180-84 (2004).

Here, Jason will participate in sex offender treatment while incarcerated and when released to supervision. As demonstrated by his psychological evaluation, Jason is very amenable to this treatment and will likely gain much from participating. Thus, his age, treatment opportunities, and post-release supervision indicate that the likelihood of his recidivism will significantly diminish. Therefore, 15 years, plus life supervision, would be a sentence sufficient, but not greater than necessary, to satisfy the remaining federal interests involved in this case.

**4. Remorse and Acceptance of Responsibility**

Jason has accepted responsibility for his actions and is extremely remorseful for what he has done. After his arrest, Jason confessed to his crimes and admitted wrongdoing. He did not want anyone involved to have to testify or put anyone else through any more pain by going through with a trial. Jason feels horrible about what he has done to the victims and what they will have to endure. Additionally, he feels incredible remorse for the impact that his actions will have on his family, particularly Nicole and his children. He understands the seriousness of his offense and sincerely wants to change his life for the better.

**5. The PSR's Advisory Guideline Sentence is Miscalculated**

First, the PSR miscalculated the "total punishment." Under Guideline § 5G1.2(b), "the court shall determine the total punishment and shall impose that total punishment on each count." U.S. Sentencing Guidelines Manual § 5G1.2(b) (U.S. Sentencing Comm'n 2014). The Guidelines define "total punishment" as the total "determined by the court after determining the adjusted combined offense level and the Criminal History Category and determining the defendant's guidelines range on the Sentencing Table in Chapter 5, Part A." U.S. Sentencing Guidelines Manual § 5G1.2 cmt. n.1 (U.S. Sentencing Comm'n 2014). Here, the adjusted combined offense level was 43 (PSR ¶197) and the Criminal History Category was I (PSR ¶204), resulting in a Sentencing Table range of life. Thus, the "total punishment" for the purposes of Guideline § 5G1.2(b) was life. The PSR, however, characterized the "total punishment" for the purposes of Guideline § 5G1.2(b) as 550 years (PSR ¶ 226)- a sum reached by adding together the statutory maximum term for each count. The PSR erred in that characterization.

Second, the PSR compounded its error when it applied its erroneous "total punishment" calculation to the Guideline governing whether to impose concurrent or consecutive sentences. Guideline § 5G1.2(d) states that:

> [i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentences imposed on one or more of the other

9

>  counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently.

Sentencing Guidelines Manual § 5G1.2(d) (U.S. Sentencing Comm'n 2014) (emphasis added). The emphasized language expresses the long-standing preference in American courts for concurrent sentences rather than consecutive sentences. *See* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively."); *United States v. Martinez*, 274 F.3d 897, 903 n.5 (5th Cir. 2001) (characterizing § 5G1.2 as "labeling concurrent sentences as the default"; *United States v. Hardrich*, 707 F.2d 992, 993 n.1 (8th Cir. 1983) (noting that the National Advisory Commission on Criminal Justice Standards and Goals "recommends a presumption in favor of concurrent sentences for multiple offenses"). Here, having have erroneously determined that the "total punishment was 550 years, the PSR concluded that, under § 5G1.2(d), imposing the maximum statutory sentence on every count to be served consecutively would impose "a Guideline sentence." What the PSR was actually required to calculate was to impose consecutive sentences *but only to the extent necessary* to produce a combined sentence of *life*. The United States Sentencing Commission defines a life sentence as 470 months (39.2 years). United States Sentencing Commission, *Life Sentences in the Federal System*, (Feb. 2015). The Social Security Administration calculates that a man born on October 9, 1975 can expect to live, on average, until age 82. SOCIAL SECURITY ADMINISTRATION, CALCULATORS: LIFE EXPECTANCY, https://www.ssa.gov/OACT/population/longevity.html. Under the Social Security standard, a life sentence for Jason would be 41.2 years. Thus, in order to impose a guideline sentence, the Court would impose consecutive sentences amounting to 41.2 years.

### 6. A Life Sentence is Excessive and "Greater Than Necessary"

Sentencing a defendant to likely die in prison is a decision that courts have taken with great scrutiny. As the Seventh Circuit has stated, "there is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court. " *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006). A life sentence would deprive Jason the opportunity to rehabilitate himself and rejoin society.

In addition to the clear impact that a sentence amounting to life imprisonment would have on Jason, there is a larger-scale sentencing issue present as well. Namely, by imposing such a harsh sentence in this case, there would be virtually no greater sentence available for harsher crimes, namely, murder. Punishing Jason as severely as a murderer disrupts the goal of marginal deterrence, the idea that "the harshest sentences should be reserved for the most culpable behavior." *United States v. Newsom*, 402 F.3d 780, 785–786 (7th Cir. 2005). As discussed by the United States Supreme Court, "there is a line between homicide and other serious violent offenses against the individual" and "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Graham v. Florida,* 560 U.S. 48, 69 (2010). Taking into account this spectrum of crimes and their varying degrees of severity, the United States Sentencing Commission has strived to "preserve proportionality" regarding child pornography offenses. United States Sentencing Commission, *The History of the Child Pornography Guidelines* 48 (2009). A sentence amounting to life imprisonment is clearly incongruent with this goal.

### III. CONCLUSION

Jason Kopp has a history of abuse and psychological impairment that ultimately led to the instant offense. Given the history behind the legislation concerning sexual exploitation of children, the guideline sentence of essentially life imprisonment is unnecessarily excessive. Such

a sentence would be incongruent with his offense and the overall goals of sentencing outlined in 18 U.S.C. § 3553(a). It would unfair and inaccurate to determine that Jason cannot be rehabilitated. With 15 years' imprisonment and treatment, Jason can be capable of reentering society. Based upon the foregoing, a sentence at the statutory mandatory minimum term of 15 years' imprisonment on each count, imposed to run concurrently and followed by lifetime supervision, would comply with the statutory goals of punishment.

### REQUEST FOR JUDICIAL RECOMMENDATION

The defense requests that the Court recommend that Bureau of Prisons designate Jason be placed in FCC Tucson as that facility has a sex offender treatment program which he would like to participate in.

DATED: August 24, 2016

LISA A. PEEBLES
FEDERAL PUBLIC DEFENDER
By: */s/ Randi J. Bianco, Esq.*
Assistant Federal Public Defender
Bar Roll No. 507514
Clinton Exchange, 3rd Floor
4 Clinton Street
Syracuse, New York   13202
(315) 701-0080

To:  Lisa Fletcher, Esq., AUSA
     United States Probation Department
     Jason Kopp